Christopher Justin Eads
Reg No. 10391-028
Federal Correctional Institution
P.O. Box 420
Fairton, NJ 08320
**Pro se**

RECEIVED
SEP 27 2019
AT 8:30_____M
WILLIAM T. WALSH, CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CHRISTOPHER JUSTIN EADS,
     Plaintiff,

     v.

FEDERAL BUREAU OF PRISONS,
UNITED STATES OF AMERICA,
     Defendants.

No._____

**VERIFIED COMPLAINT**

**BY PRISONER**

RECEIVED
SEP 27 2019
AT 8:30_____M
WILLIAM T. WALSH, CLERK

## I.  JURISDICTION

1.  Jurisdiction of this Court, over the Federal Bureau of Prisons is invoked pursuant to 5 U.S.C. §701 et seq; Administrative Procedures Act.

2.  Jurisdiction of this Court, over the United States of America is invoked pursuant to 28 U.S.C. §1331; Original Jurisdiction.

## II.  PARTIES

3.  Plaintiff, Christopher Justin Eads at all relevant times was incarcerated at Federal Correctional Institution - Fairton, New Jersey.

4.  Defendant, Federal Bureau of Prisons at all relevant times operated Federal Correctional Institution - Fairton, New Jersey.

5.  Defendant, United States of America at all relevant times

1

employed Dr. Abigail Lopez de Lasalle, in her Official Capacity, and was in control of Federal Correctional Institution - Fairton, New Jersey.

### III.   PREVIOUS LAWSUITS

6.   Plaintiff has filed a suit in the U.S. District Court for the Southern District of Indiana, Evansville Division, Case No. 3:18-CV-00190-RLY-MPB.

7.   Plaintiff has filed a suit in the U.S. District Court for the District of Colorado, Case No. 17-CV-02476-GPG.

### IV.   ADMINISTRATIVE REMEDIES

8.   Plaintiff has sought both informal resolution and has filed a formal request for administrative remedy and appeals through the BOP's Administrative Remedy Program.

### V.   RELEVANT FACTS

9.   On June 12, 2018, Plaintiff was assaulted by his cellmate while housed in the Special Housing Unit (SHU) at USP Tucson, Arizona.

10.   On June 28, 2018, after being released from the SHU Plaintiff was able to report to Sick-Call, wherein he was taken to the emergency room at Tucson Medical Center (TMC).

11.   On June 29, 2018, TMC Neuroradiologist Perry M. Stevens, after a CT scan of Brain Sinus - Facial without contrast document that Plaintiff had fractures to the nasal bones and maxillary frontal processess.

2

5.    On July 17, 2018, I was advised by an Ears/Nose/Throat (ENT) specialist that I needed to follow-up in 6 months for possible corrective/plastic surgery regarding my broken nose, due to my inability to breathe out of my right nasal passage, and because my nasal bridge was deviated to the right.

6.    I believe I have showed signs indictive of post-concussive syndrome from June 13, 2018 until the present moment; and on information and belief, the BOP and it's Health Services Defendants are aware of my injuries, traumas and pain and suffering.

7.    On February 14, 2019, I was advised by an outside Ophthalomologist that I was suffering from a concussion (post-concussive syndrome), and that if not addressed, it could potentially be life-threatening. I was further advised by the Ophthalomologist that all my symptoms were not consistant with any specific eye injury, but was conclusive for a concussion. Lastly, the Ophthalomologist advised me that I needed to be evaluated by a Neurologist for my post-concussive syndrome and he made a recommendation to the BOP and it's Health Services Defendants for me to be treated and cared for by a Neurologist for my injuries.

8.    On information and belief, on March 8, 2019, the BOP and it's Health Services Defendants denied my recommended plan of care and treatment for my post-concussive syndrome.

9.    On information and belief, on March 15, 2019, and after submitting repeated requests for the recommended 6 month follow-up for possible ENT corrective/plastic surgery, that recommendation was affirmatively denied.

10.   I was advised for a second time on April 29, 2019, that I

-2-

12.    On June 29, 2018, TMC doctors recommended that the prison follow-up care for Plaintiff with an Ophthalmologist "as soon as possible for a visit in 3 days for vision changes in left eye" and to an ENT specialist "as soon as possible for a visit in 2 weeks for nasal fractures".

13.    On June 29, 2018, USP Tucson's medical department conducted an Optometry exam on Plaintiff, wherein they documented an unspecified disorder of eye and adnexa, occasional flashes in left eye following trauma.

14.    On June 29, 2018, USP Tucson's medical department documented TMC doctor's recommendation and referrals to an ENT for possible nasal surgery and to an Ophthalmologist.

15.    USP Tucson's medical staff marked the referral to the Otolaryngologist (ENT) as "Urgent" and set a target date for July 13, 2018, and the referral to the Ophthalmologist as "Routine" and set a target date of September 7, 2018.

16.    Plaintiff was transferred from USP Tucson on July 5, 2018, and arrived at FCI Fairton, New Jersey on July 9, 2018.

17.    When Plaintiff arrived at FCI Fairton he followed up with their  medical department to address his injuries and the referrals documented at USP Tucson.

## VI.    FACTUAL STATEMENT

18.    On July 17, 2018, Plaintiff was sent to Rodolfo Diaz MD/ENT specialist who addressed a closed fracture of the nasal bone, deviated septum, nasal congestion, and documented a "nasal mucosa abnormal with nasal congestion. Septum deviated to right..."

3

19. The ENT told Plaintiff he would follow up with him to determine if he needed surgery to correct his inability to breathe from his right nasal passage.

20. The ENT documented the recommendation to reevaluate with prison medical staff for any airway obstruction, for deviated nasal septum, in 6 months.

21. The ENT documented a recommendation to use a nasal hygiene regimen such as the use of saline nasal spray 2-3 times a day.

22. The ENT documented a recommendation to use Mucinex (without decongestants added) to help decrease the viscosity of mucus and help increase drainage.

23. July 17, 2018, on a medical trip return examination RN Thang Nguyen, Fairton medical staff documented that the ENT recommended that Plaintiff follow-up with prison medical staff for airway obstruction and follow-up in 6 months for possible plastic surgeon referral.

24. RN Nguyen did not document the ENT's recommendation for the use of saline nasal spray 2-3 times a day or the use of Mucinex (without decongestants added) to help decrease the viscosity of mucus and help increase drainage.

25. On July 17, 2018, on a medical trip return examination Abigail Lopez de Lasalle MD, Fairton medical staff, documented that Plaintiff did not need ENT follow-up and that prison medical staff will manage in-house.

26. Dr. Lopez documented that Plaintiff had congestion, mucoid discharge, and purulent discharge.

27. Dr. Lopez failed to document or prescribe the ENT's

4

recommended treatment of saline nasal spray 2-3 times a day or the use of Mucinex (without decongestants added) which would help decrease the viscosity of mucus and help increase drainage, and documented no need for ENT follow-up.

28.  RN Nguyen and Dr. Lopez did not prescribe Plaintiff with saline nasal spray or Mucinex.

29.  On February 20, 2019, Plaintiff sent an electronic request to medical for a follow-up with the ENT for possible corrective surgery becuase he could not breathe from his right nasal passage.

30.  Medical staff responded by stating that the ENT said to follow-up with Plaintiff's primary care provider in 6 months, and if he was still having issues to submit a Sick Call.

31.  On March 8, 2019, APN/RN Rodriguez also reviewed with Plaintiff the 7/2018 ENT consult which recommeded saline nasal irrigation but never mentioned the use of Mucinex and did not prescribe saline nasal irrigation nor addressed the ENT's recommended follow-up for possible corrective surgery.

32.  On March 8, 2019, Plaintiff sent an electronic request to medical asking for information about treatment for his broken nose and obstructed right nasal passage.

33.  Medical staff's March 11, & 13, 2019, responses did not address the issue with Plaintiff's nose.

34.  On March 13, 2019, Plaintiff sent another electronic request to medical about not being able to breathe.

35.  On the same day the response from medical staff stated that the provider indicated Plaintiff's most recent ENT consult ended

5

with a recommendation to use saline nasal spray to manage complaints related to nasal fracture and deviated septum.

36.   After several exchanges about treating Plaintiff's, blocked right nasal passage and his inability to breathe from that side, medical stated on March 14, 2019, that there was no plan to send Plaintiff to and ENT, that the use of saline spray was the only recommendation, and to submit a Sick Call request to discuss the plan of case.

37.   On March 15, 2019, Plaintiff submitted a Sick Call request reporting that he still could not breathe from his right nasal passage and requested to see the ENT for possible corrective surgery.

38.   On March 18, 2019, APN/NP Rodriguez documented that Plaintiff was evaluated by the ENT on July 17, 2018, and sent the request back to Plaintiff.

## CAUSES OF ACTION

### A.   ARBITRARY ACTION BY BOP
(Federal Bureau of Prisons)

39.   The BOP's actions were arbitrary and capricious, and an abuse of discretion when, on July 17, 2018, Rodolfo Diaz MD/ENT evaluated Plaintiff, addressed a closed fracture of nasal bone, deviated septum, and nasal congestion, and recommended Plaintiff follow-up with PCP for airway obstruction and a possible referral from the ENT in 6 months for corrective surgery, and:

6

A.   On February 20, 2019, Plaintiff notified medical staff by electronic message and Sick Call request that he could not breathe from his right nasal passage and requested the 6 month follow-up with ENT for a referral for corrective surgery. Medical staff responded stating that the ENT said to follow-up with the PCP in 6 months and to submit a Sick Call if he was still having problems, and on March 8, 2019, medical staff reviewed the July 2018 ENT consult's recommendation to use nasal saline regimen but did not prescribe the nasal saline regimen.

B.   On March 8, 2019, Plaintiff notified medical staff by electronic message that he could not breathe from his right nasal passage and on March 11 & 19, 2019, medical staff did not respond to Plaintiff's inability to breathe.

C.   On March 13, 2019, Plaintiff notified medical staff by electronic message that he could not breathe from his right nasal passage, and on March 13, 2019, medical staff responded stating that Plaintiff's provider indicated that his most recent ENT consult (July 2018) ended with a recommendation to use saline nasal spray to manage his complaints about his nasal fracture and deviated septum but did not address his complaints of an inability to breathe from his right nasal passage.

D.   On March 14, 2019, Plaintiff questioned medical staff by electronic message about seeing the ENT, and medical staff responded stating that there was no plan to send him to the ENT at that time and based on the last visit (July 2018) with the ENT; the use of saline spray was the only recommendation, even though medical staff documented, and the ENT told Plaintiff that

7

he would follow-up in 6 months for a possible surgeon referral.

E.  On March 15, 2019, Plaintiff notified medical staff by Sick Call request that he could not breathe from his right nasal passage and requested to see the ENT for a referral for corrective surgery, and medical staff responded on March 18, 2019, stating that Plaintiff was "evaluated by the ENT specialist on July 17, 2018.

40.  The BOP's offered explanation why Plaintiff will not be seen by the ENT for a follow-up, namely that Plaintiff has not reported breathing problems and the July 2018 consult ended only with a recommendation to use saline nasal spray is counter to the ENT's reports documented in Plaintiff's medical record. The BOP Health Services Clinical Encounter documented "follow-up in 6 months for possible plastic surgeon referral" to which the BOP, abused their discreation, and arbitrarily denied the requests to be seen be the ENT after numerous complaints of his inability to breathe from his right nasal passage.

B.  **ARBITRARY ACTION BY BOP**

(Federal Bureau of Prisons)

41.  The BOP's actions were arbitrary and capricious, and an abuse of discretion when, on July 17, 2018, Rodolfo, Diaz MD/ENT evaluated Plaintiff, addressed a closed fracture of nasal bone, deviated septum, and nasal congestion and recommended the use of nasal hygiene regimen such as the use of saline spray 2-3 times a day and to use Mucinex (without decongestants) and:

8

A. On July 17, 2019, during the medical trip return evaluations 2 medical staff failed to document the recommended treatment or prescribe the treatment.

B. On March 8, 2019, medical staff during an evaluation of Plaintiff reviewed, with him, the July 2018 ENT consult's recommendation for nasal saline regimen, but never mentioned the use of Mucinex or prescribed the Plaintiff with saline nasal spray or Mucinex.

42. The BOP's decision to not prescribe the ENT's recommended treatment is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise because the ENT was a specialist in the field of treating the specific injury and the BOP entirely failed to consider an important aspect of the problem, namely that Plaintiff was having problems breathing from his right nasal passage.

## VII.   FACTUAL STATEMENT

43. On August 2, 2018, Francis Sieber OD, FCI Fairton medical staff, documented that Plaintiff had vitreous liquefaction (floaters) in both eyes, and documented that an appointment for follow-up was to be scheduled in 8 weeks for review, and educated Plaintiff regarding the findings, reviewed retinal tear/detachment symptoms and signs, and instructed Plaintiff to immediately notify medical staff for prompt exam if symptoms worsened.

44. On September 18, 2018, Plaintiff filed a Sick Call requesting treatment, as directed by Dr. Sieber, for worsening

9

vision and pain in the left eye and reported on the Sick Call that he had taken Ibuprofen but it was not helping the pain.

45.  On October 2, 2018, Plaintiff filed a second Sick Call reporting that his vision and pain was worsening. Plaintiff again reported that he was taking Ibuprofen, but needed something else for his constant pain.

46.  On December 2, 2018, Plaintiff filed a third request reporting that he could not see out of his left eye and was in pain and reported that he stopped taking Ibuprofen and requested to be prescribed pain medication.

47.  On December 4, 2018, Plaintiff sent an electronic request to the medical department (Optometrist) reporting that he was seeing spots and flashes of light, pain caused by sun light, and worsening vision in his left eye, and stated that he had submitted several Sick Call requests.

48.  On December 5, 2018, the medical department responded, stating that Plaintiff was evaluated in August for the reported conditions and was scheduled for a follow-up visit in the near future.

49.  On Decmeber 21, 2018, Plaintiff saw Dr. Sieber in the waiting room of the medical department, but told Plaintiff he was late and would be rescheduled.

50.  On January 8, 2019, Plaintiff sent an electronic request to the medical department stating that he was called to medical for a TB test but thought he was called to be seen for his reported worsening vision and pain in the left eye.

51.  On January 10, 2019, the medical department responded

10

stating that Plaintiff was on the call-out that day and that he was late for his last appointment resulting in it being rescheduled.

52.   Plaintiff responded stating that he was on time for the December 21, 2018, appointment, Dr. Sieber and Lopez saw him in the waiting room but he was never examined.

53.   On January 10, 2019, Plaintiff was seen by Francis Sieber OD, prison medical staff, and documented that Plaintiff reported a foreign body sensation in the left eye and prescribed lubrication, tears for relief of symptoms and an Ophthalmology consult for evaluation of retina and symptoms.

54.   On January 10, 2019, Francis Sieber OD documented a provisional diagnosis of Plaintiff as R/o retinal/vitreous compromise and ordered glasses.

55.   During the appointment with Dr. Sieber, he told Plaintiff to see Dr. Lopez for pain medication.

56.   Plaintiff saw Dr. Lopez right after he saw Dr. Sieber, but she told him to submit a Sick Call request if he needed medication.

57.   On January 10, 2019, Plaintiff sent an electronic request to Dr. Lopez stating that Dr. Sieber did not address his reports of pain and was told to contact her for pain medication.

58.   On January 10, 2019, Plaintiff filed a Ilick Call stating that he was seen that day but his reports of pain were not addressed.

59.   On January 11, 2019, the medical department responded to Plaintiff stating that he would be scheduled for an appointment

11

once they received his Sick Call request, and while he waited he could purchase pain medication from the commissary.

60. On January 14, 2019, Plaintiff filed another Sick Call reporting the same as the January 10, 2019, Sick Call request.

61. On January 14, 2019, Plaintiff sent an electronic request to Dr. Lopez asking why medical would not treat his reports of pain from his left eye injury from 8 months prior.

62. On January 15, 2019, Dr. Lopez responded stating that the Optometrist wrote a prescription for artificial tears to ease his pain and there was medication available on commissary while he waited.

63. Plaintiff responded to Dr. Lopez informing her that the commissary Ibuprofen does not help.

64. On January 16, 2019, Denise Rodriguez, APN/NP FCI Fairton medical staff, scheduled an appointment for January 17, 2019, for Plaintiff's reports of pain and request for pain medication.

65. On January 16, 2019, Plaintiff sent an electronic request to the medical department, wherein he addressed his past requests for treatment of his pain over the last five months.

66. On January 17, 2019, FCI Health Service Administrator, CDR Murphy, the head of medical, responded stating that Plaintiff could speak to him at mainline if he had clinical concerns, and that Plaintiff should submit a Sick Call rquest for his pain.

67. On January 17, 2019, during an appointment with Rodriguez ANP/NP Plaintiff told her that he was taking Ibuprofen and that it was not helping his pain.

68. On January 17, 2019, Rodriguez APN/NP documented during

12

Plaintiff's medical appointment that he requested treatment for left eye pain, and that review of Plaintiff's commissary purchases revealed that no commissary analgesic of any type were purchased, and scheduled a follow-up with provider for February 8, 2019.

69.  After Plaintiff's appointment he sent an electronic request to Dr. Lopez reporting that he did not receive treatment for his pain, and that the Ibuprofen he was taking was not working and he was worried that excessive amounts would cause harm to him.

70.  On January 17, 2019, Plaintiff talked to CDR Murphy, and informed him of the continuous requests to medical for treatment of pain, the lack of treatment, that pain still existed and that Plaintiff was not getting relief from the commissary Ibuprofen or the 600mg or 800mg Ibuprofen he was getting from other inmates.

71.  Plaintiff also told CDR Murphy that the pain was severe enough that he could hardly close his eye, bright light intensified the pain to nausea and vomiting, and he was getting headaches behind his left eye.

72.  CDR Murphy told Plaintiff to purchase Ibuprofen from commissary.

73.  Plaintiff documented the conversation with CDR Murphy through an electronic request to medical.

74.  On January 22, 2019, CDR Murphy responded by directing Plaintiff to sign up for Sick Call if he felt he needed additional care.

75.  On January 23, 2019, Plaintiff submitted the Sick Call request as directed by CDR Murphy requesting treatment for pain

13

in his left eye, reporting that he was getting headaches, vomiting, that he could not see out of his left eye, and that he stopped taking Ibuprofen becuase it was not helping the pain.

76.  On January 24, 2019, Plaintiff informed CDR Murphy that he had submitted the Sick Call request which Murphy noted on the same day.

77.  On January 30, 2019, Plaintiff sent an electronic request to CDR Murphy stating that he had not been seen by medical for his reports of pain, vomiting, and headaches from his eye injury.

78.  On January 31, 2019, CDR Murphy responded stating that an appointment with the ophthalmologist was scheduled for the near future, and that the provider suggested Plaintiff use pain medication from commissary and would then follow-up to see how it worked, and records showed Plaintiff was not purchasing the pain medication.

79.  On February 14, 2019, Plaintiff was seen by an outside Ophthalmologist, Thomas I. Margolis, MD, who conducted an examination and documented decreased vision of unknown cause OS indicating that Plaintiff may have supratentorial vision loss, Photophobia OS, that Plaintiff may be suffering from post-concussive syndrome and recommended Neurologic consultation.

80.  On February 14, 2019, on a medical trip return examination, Tracey Hepner RN/AHSA documented that Plaintiff reported extreme pain, cloud-like fog and sensitivity to light in the left eye, and that he had thrown up twice, with a pain scale of 8.

81.  RN/AHSA Hepner also documented that Plaintiff had sightly elevated blood pressure, left eye sclera red and sightly watery,

14

pain of 8/10 behind left eye and left side of head, that Plaintiff reported he was using 600mg-800mg Ibuprofen, "eating them like candy" for pain control, educated him on proper use and side effects of overuse, that Plaintiff had decreased vision of unknown cause OS, Photophobia OS and that due to reported symptoms and ongoing issues the physician recommends Neurologic consult for post-concussion syndrome, and Plaintiff can stop using prescribed tears 1.4% if desired.

82. On February 21, 2019, Plaintiff filed a Sick Call request to determine if he was going to see the Neurologist and reported continuing pain, the use of Ibuprofen, and lack of vision in his left eye.

83. APN/NP Rodriguez documented that Plaintiff was scheduled for a follow-up on March 8, 2019.

84. On March 8, 2019, APN/NP Rodriguez saw Plaintiff and documented that Plaintiff demonstrates difficulty keeping left eye open in presence of normal room lighting due to stated sensitivity, there was some tearing from left eye, that a visual field test was pending, and that the Utilization Review Committee deemed the Neuro consult not indicated, but never treated Plaintiff's pain.

## CAUSE OF ACTION

A. **ARBITRARY ACTION BY BOP**

(Federal Bureau of Prisons)

15

85.   The BOP's actions were arbitrary and capricious, and an abuse of discretion when, on August 2, 2018, Francis Sieber OD evaluated Plaintiff, educated him on the findings and instructed him to report worsening symptoms for a prompt exam and:

A.   On September 18, October 2, December 2, and December 4, 2018, Plaintiff notified medical staff of worsening symptoms and pain in the left eye and on September 18, and October 2, he notified medical staff that he was taking Ibuprofen but it was not working, medical staff waited until December 5, 2018 to respond by stating that Plaintiff was evaluated in August for the reported conditions and was scheduled for a follow-up visit in the near future which was not scheduled until December 21, 2018, and not conducted until January 10, 2019.

B.   On January 10, 2019, Plaintiff was evaluated for his worsening symptoms and pain. Dr. Sieber documented a provisional diagnosis of R/o retinal/vitreous compromise but only prescribed lubrication tears and glasses, then told Plaintiff to see Dr. Lopez for pain medication.

C.   On January 10, 2019, Plaintiff spoke with and sent an electronic message to Dr. Lopez about Dr. Sieber not addressing his pain; Dr. Lopez told Plaintiff to submit a Sick Call request instead of addressing his pain. And on July 11, 2019, Dr. Lopez stated they would schedule an appointment when they received the Sick Call, and while Plaintiff waited he could purchase pain medication from commissary, which Plaintiff reported on September 18 and October 2, 2018, the Ibuprofen was not working.

D.   On January 14, 2019, Plaintiff questioned medical staff by

16

electronic message and Sick Call request, why they would not treat his pain in his left eye, and they responded on January 15, 2019, stating that the Optometrist prescribed artificial tears to ease his pain and there was medication available on commissary while he waited, and which Plaintiff had already informed them was not working.

E.   On January 16, 2019, Plaintiff notified the head of medical staff of his continued requests for treatment of his pain stemming from an eye injury and medical staff's failure to treat the condition for 5 months. The head of medical staff told Plaintiff to submit a Sick Call request and to speak with him at mainline. At mainline Plaintiff informed the head of medical staff that he was not getting relief from the use of 600mg or 800mg Ibuprofen, and he could  hardly close his left eye, bright light intensifies the pain to nausea and vomiting, and he was getting headaches behind his left eye. The head of medical staff told Plaintiff to purchase Ibuprofen from commissary and on January 23, 2019, he told Plaintiff to sign up for Sick Call if he felt he needed additional care.

F.   On January 17, 2019, Plaintiff was seen by medical staff for his reports of pain in his left eye and told them that he was taking Ibuprofen which was not helping, but instead of prescribing something for his pain they reviewed Plaintiff's commissary purchases and said he had not purchased commissary analgesic of any type and scheduled a follow-up for February 8, 2019.

G.   On January 23, 2019, Plaintiff notified medical staff by

17

Sick Call request that he was directed by the head of medical to request treatment and informed them that he was getting headaches, vomiting, that he could not see from his left eye and he had stopped taking Ibuprofen because it was not helping his pain. On January 24, 2019, Plaintiff told the head of medical staff that he submitted a Sick Call request for treatment of his pain. On January 30, 2019 Plaintiff sent an electronic message to the head of medical staff as he directed, and notified him that he had not been seen for reports of pain, vomiting, and headaches from his eye injury. But instead of addressing the pain, the head of medical staff responded on January 31, 2019, that Plaintiff was scheduled to see the Ophthalmologist in the near future and that the provider suggested he use pain medication from commissary but record showed Plaintiff was not purchasing the pain medication.

H.    On February 14, 2019, on a medical return trip from the Ophthalmologist, the medical staff examined Plaintiff, documented that he reported extreme pain on a scale of 8, a cloud-like fog, sensitivity to light in the left eye, that he had thrown up twice, he had a sightly elevated blood pressure, left eye sclera red and sightly watery, and pain of 8/10 behind the left eye and on left side of head, and that Plaintiff reported using Ibuprofen 600mg - 800mg for pain control. Medical staff only educated Plaintiff on the proper use of Ibuprofen and the side effects of overuse and documented that the Ophthalmologist recommended a Neurologic consult for post concussive syndrome and that Plaintiff could stop using the prescribed tears 1.4%.

18

I.   On February 21, 2019, Plaintiff notified medical staff by Sick Call request of continuing pain even though he was using Ibuprofen. Medical staff never treated Plaintiff's pain.

86.   The BOP's decision to not treat Plaintiff's continued reports of worsening symptoms and pain even while he was self medicating with 600mg and 800mg Ibuprofen is so implausible that it could not be ascribed to a difference in view or product of agency expertise and entirely failed to consider an important aspect of the problem, namely that their own doctor told Plaintiff to report worsening symptoms for a prompt exam and that the Ibuprofen was not helping the pain.

## VIII.   FACTUAL STATEMENT

87.   On February 14, 2019, Plaintiff was seen by an outside Ophthalmologist, Thomas I. Margolis, MD, who conducted an examination and documented decreased vision of unknown cause OS indicating that Plaintiff may have supratentorial vision loss, and Photophobia OS that Plaintiff may be suffering from post-concussive syndrome and recommended Neurologic consultation.

88.   On February 21, 2019, Plaintiff sent an electronic request to medical staff to determine if he was being scheduled to see the recommended Neurologist.

89.   On the same day, medical staff responded stating that Plaintiff's Neurology consult was not approved by the Clinical Director.

19

## CAUSE OF ACTION

### A.   ARBITRARY ACTION BY BOP

(Federal Bureau of Prisons)

90.   The BOP's actions were arbitrary and capricious, and an abuse of discretion when, on February 14, 2019, Thomas I. Margolis MD/Ophthalmologist evaluated Plaintiff and documented he possibly had post concussive syndrome and recommended that he see a Neurologist, and:

A.   On February 21, 2019, Plaintiff questioned by electronic message, when he would be scheduled to see the Neurologist. On the same day medical staff responded that they did not approve Plaintiff to see the Neurologist.

91.   The BOP's decision to deny the Ophthalmologist's recommendation for Plaintiff to see a Neurologist after diagnosing that Plaintiff possibly suffers from post-concussive syndrome entirely failed to consider an important aspect of the problem and the denial is so implausible that it could not be ascribed to a difference in view or product of the agency expertise, namely Plaintiff could suffer further damage or permanent damage and the Ophthalmologist was the specialist in the field of the particular care.

## IX.   FACTUAL STATEMENT

92.   On April 12, 2019, Plaintiff was seen by Dr. Lopez who documented that Dr. Margolis' examination indicated that

20

Plaintiff may have supratentorial vision loss, that a vision field test is recommended, and Plaintiff was unable to keep his eye open during an exam.

93.  Dr. Lopez also documented that she would consult the Clinical Director and at her discretion would schedule a follow-up to discuss a treatment plan.

94.  On April 16, 2019, Plaintiff was seen by the outside Ophthalmologist, Dr. Margolis, who conducted a Humphrey visual field test.

95.  Dr. Margolis documented that the findings are suspicious for functional visual loss, and if the prison doctors feel that further evaluation is indicated he would recommend that Plaintiff be seen by a Neuro-Ophthalmologist "Priority High".

96.  On April 25, 2019, Plaintiff met with medical staff who advised him that the Neuro-Ophthalmologist recommendation was denied.

## CAUSE OF ACTION

A.  **ARBITRARY ACTION OF BOP**

(Federal Bureau of Prisons)

97.  The BOP's actions were arbitrary and capricious, and an abuse of discretion when, On April 16, 2019, Thomas I. Margolis MD/Ophthamologist conducted a Humphrey vision field test on Plaintiff after finding he may have supratentorial vision loss, and documented the findings are suspicious for functional vision

21

loss, and recommended Plaintiff be seen by a Neuro-Ophthalmologist "Priority High", and:

A.   On April 25, 2019, Plaintiff met with medical staff who advised him that the Neuro-Ophthalmologist recommendation was denied.

98.   The BOP's decision to deny the Ophthalmologist's recommendation for Plaintiff to see the Neuro-Ophthalmologist after he failed a visual field test which showed suratentorial and functional vision loss entirely failed to consider an important aspect of the problem and the denial is so implausible that it could not be ascribed to a difference in view or product of the agency expertise, because Plaintiff could suffer further damage or permanent damage and the Ophthalmologist is the specialist in the field of particular care.

## X.   FACTUAL STATEMENT

99.   On July 17, 2018, Plaintiff was seen by Rodolfo Diaz MD/ENT specialist, who addressed a closed fracture of the nasal bone, deviated septum, nasal congestion, and documented a "nasal mucosa abnormal with nasal congestion. Septum deviated to right..."

100.   The ENT told Plaintiff he would follow-up with him to determine if he needed surgery to correct his inability to breathe from his right nasal passage.

101.   The ENT documented the recommendation to reevaluate with prison medical staff for any airway obstruction, for deviated nasal septum, in 6 months.

102.   The ENT documented a recommendation to use a nasal hygiene

22

regimen such as the use of saline nasal spray 2-3 times a day.

103. The ENT documented a recommendation to use Mucinex (without decongestants added) to help decrease the viscosity of mucus and help increase drainage.

104. Dr. Lopez failed to document or prescribe the ENT's recommended treatment of saline nasal spray 2-3 times a day or the use of Mucinex (without decongestants added) to help decrease the viscosity of mucus and help increase drainage, and documented no need for ENT follow-up.

105. On January 10, 2019, Francis Sieber OD documented a provisional diagnosis of Plaintiff as R/o retinal/vitreous compromise and ordered glasses.

106. On February 14, 2019, Plaintiff was seen by an outside Ophthalmologist, Thomas I. Margolis, MD, who conducted an examination and documented decreased vision of unknown cause OS indicating that Plaintiff may have supratentorial vision loss, and Photophobia OS, that Plaintiff may be suffering from post-concussive syndrome and recommended Neurologic consultation.

107. On the same day medical responded stating that Plaintiff's Neurology consult was not approved by the Clinical Director.

108. On April 5, 2019, Plaintiff was placed on the call-out and reported to medical.

109. After reporting to medical Plaintiff was told by a nurse that he was mistakenly placed on the call-out.

110. Shortly after the nurse told Plaintiff that he was called to medical by mistake, Dr. Lopez confronted Plaintiff in the waiting room and stated that "we're treating you like this

23

because you are an inmate".

111.   On April 10, 2019, Plaintiff was informed by electronic message that he would be rescheduled to see the Clinical Director and to watch the call-out.

112.   On April 12, 2019, Plaintiff was seen by Dr. Lopez who documented that Dr. Margolis' examination indicated that Plaintiff may have supratentorial vision loss, that a vision field test was recommended, and Plaintiff was unable to keep his eye open during the exam.

113.   Dr. Lopez also documented that she would consult the Clinical Director, and at her discretion would schedule a follow-up to discuss a treatment plan.

114.   On April 16, 2019, Plaintiff was, again seen by the outside Ophthalmologist, Dr. Margolis who conducted a Humphrey visual field test.

115.   Dr. Margolis documented that the findings are suspicious for functional visual loss, and if the prison doctors feel that further evaluation is indicated he would recommend that Plaintiff be seen by a Neuro-Ophthalmologist "Priority High".

116.   On April 25, 2019, Plaintiff was called to medical by Dr. Lopez and the Clinical Director, Dr. McGann, who advised Plaintiff that the referred Neurological consult was denied, and confronted Plaintiff about his claims of not receiving desirable care because he was an inmate.

117.   Plaintiff was confronted by Dr. Lopez about saying, on April 5, 2019, that they were treating him like this because he was an inmate.

24

118.  Plaintiff documented in an electronic request to medical that he walked out of the room because of the inappropriate confrontational situation he was put in by Dr. Lopez and Dr. McGann.

119.  Dr. Lopez was Plaintiff's primary care provider and signed off on all evaluations, recommendations, and treatments or the denial of such.

## CAUSE OF ACTION

A.  **EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED**

(Defendant Dr. Abigail Lopez de Lasalle, MD, Official Capacity, United States)

120.  Plaintiff had a serious medical need after he was assaulted and was diagnosed with closed fracture of nasal bone, deviated septum, nasal congestion, airway obstruction, pain in the left eye, R/o retinal/vitreous compromise, possible post concussive syndrome, supratentorial vision loss photophobia, and possible functional vision loss with a recommendation to follow-up with an ENT for corrective surgery, to use nasal saline spray and Mucinex without decongestants, a recommendation to follow-up with a Neurologist and Neuro-Ophthalmologist "Priority High".

121.  Dr. Lopez acted with deliberate indifference to Plaintiff's serious medical needs because:

A.  She knew of Plaintiff's severe medical needs as she was his

25

primary care provider and signed off on all evaluations, treatments, and recomendations.

B.    Failed to act on three (3) separate recommendations for consultations for further treatment by specialists, failed to prescribe the recommended treatments made by the ENT, and did not treat Plaintiff's repeated complaints of pain even with the use of Ibuprofen which was not working, and when Plaintiff reported frustrations to Dr. Lopez that she was not treating him properly, she stated "we're treating you like this because you are an inmate."

C.    Dr. Lopez assessed another inmate who had a similar injury, and recommendation as Plaintiff's, and she approved treatment for that inmate.

i.    Inmate William Seevers was also injured while at USP Tucson before being transferred to FCI Fairton. Seevers suffered his injury when he was hit in the nose with a softball. Seevers was transferred to FCI Fairton before he could obtain treatment at USP Tucson, so he followed-up with Medical Staff at FCI Fairton. Seevers was evaluated by Dr. Lopez, was seen by the same ENT, Dr. Diaz, that saw Plainitff, and received the same recommended plan of care and treatment as Plaintiff. However, Dr. Lopez approved Seevers to go out and have his deviated nasal septum corrected by way of corrective surgery and/or plastic surgery. But refused the same recommendations to correct Plaintiff's deviated nasal septum and receive surgery.

122.    Dr. Lopez's actions of preventing Plaintiff's treatment was the direct result of his pain and suffering, because she was the

26

final person in the chain of approval, and with her recommendation Plaintiff would have been treated, and would have had his injuries corrected.

## XI.   RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court grant the following relief:

123.   Declare that the BOP's actions of:

a.   not scheduling Plaintiff for a follow-up with the ENT for an airway obstruction and possible referral for corrective surgery was arbitrary, capricious, and an abuse of discretion,

b.   not prescribing the ENT's recommendation to use nasal hygiene such as saline spray 2-3 times a day and to use Mucinex (without decongestants) was arbitrary, capricious, and an abuse of discretion,

c.   not conducting a prompt exam after the report of worsening symptoms and not treating Plaintiff's numerous reports of pain was arbitrary, capricious, and an abuse of discretion,

d.   not scheduling a Neurological consult to determine if Plaintiff suffers from post-concussive syndrome was arbitrary, capricious, and an abuse of discretion, and

e.   not scheduling a Neuro-Ophthalmology consult to determine if Plaintiff suffers from supratentorial and functional vision loss was arbitrary, capricious, and an abuse of discretion.

124.   Declare that Dr. Lopez violated Plaintiff's Eight Amendment right to be free from deliberate indifference to a serious medical need.

27

125.   Enter a permanent injunction against Defendants, ordering them to:

a.   schedule Plaintiff for a follow-up with the ENT for the airway obstruction and possible referral for corrective surgery,

b.   prescribe the ENT's recommended treatment of nasal hygiene such as saline spray 2-3 times a day and Mucinex (without decongestants) and to provide those medications to Plaintiff at their cost,

c.   conduct a prompt exam of Plaintiff's eye injury symptoms and treat plaintiff's eye pain,

d.   schedule a Neurological consult to determine if Plaintiff suffers from post-concussive syndrome,

e.   schedule a Neuro-Ophthalmology consult to determine if Plaintiff suffers from supratentorial and functional vision loss, and

f.   refrain Dr. Lopez or any other medical staff of the BOP/United States from violating Plaintiff's Eighth Amendment right to be free from deliberate indifference to his serious medical needs by refusing to treat him because he is and inmate.

126.   Award costs associated with filing this suit.

127.   Award any other relief this Court deems just and proper.

28

## XII.  VERIFICATION

128.  I, Christopher Justin Eads, Plaintiff, verify that the facts stated in this complaint are true and correct to my knowledge, and that the facts states on information and belief are true to the best of my knowledge and belief.

Christopher Justin Eads

Date: 9/19/19

Submitted on this the 19th day of September, 2019

Respectfully,

Christopher Justin Eads

Reg. No. 10391-028

Federal Correctional Institution

Post Office Box 420

Fairton, New Jersey 08320

29